# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **DEBORAH STOUT,** ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 7:18cv00402 |
| v. ) | |
| ) | REPORT AND RECOMMENDATION |
| **LT. RAELYN HAIGHT,** ) | By: Pamela Meade Sargent |
| Defendant. ) | United States Magistrate Judge |

Plaintiff, Deborah Stout, ("Stout"), is a Virginia Department of Corrections, ("VDOC"), inmate housed at Fluvanna Correctional Center for Women, ("Fluvanna"), in Troy, Virginia. Stout initiated this civil rights action pursuant to 42 U.S.C. § 1983 alleging that defendant, Lt. Raelyn Haight, ("Haight"), violated her First Amendment rights by retaliating against her for filing complaints and grievances by refusing to allow her to seek other prison employment. The matter is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). By agreement of the parties, a bench trial was conducted by video conference before the undersigned on December 14-15, 2020. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

## *I. Evidence*

At trial, Stout testified that she was terminated from her vestibule worker job in the A-1 Housing Unit at Fluvanna by Haight on January 10, 2018. (Transcript of Day 1 of Bench Trial, ("Transcript 1"), Docket Item No. 91 at 17, 65-66.) Stout stated that she started the vestibule worker job in November 2016 and was in this

position until July 2020.[1] (Transcript 1 at 19.) Stout stated that she worked Friday, Saturday and Sunday from 6:30 a.m. to 9:30 p.m. (Transcript 1 at 31.)

Stout stated that, on January 3, 2018, Haight asked to speak to her in the Unit Manager's office. (Transcript 1 at 64.) She stated that Haight accused her of threatening to file a complaint against her for not raising her pay rate from 35 cents to 45 cents and that Haight threatened to remove her from her job, stating that she could do so for any reason. (Transcript 1 at 28, 65.) Stout testified that Haight told her that she did not need a reason to get rid of her and that she would say that the staff and the inmates were complaining about her unsatisfactory job performance. (Transcript 1 at 29, 65.) Stout stated that Haight told her that she did not like a liar and that she was sick of her. (Transcript 1 at 29, 65.) Stout explained to Haight that she liked her job, and Haight told her that she could "still work" for "right now." (Transcript 1 at 29, 65.) She stated that she continued to work but, on January 5, 2018, she was told by her Counselor, Ms. Lawrence, that she was removed from the worker's board; thus, she was unable to work on January 6, 2018. (Transcript 1 at 29, 31.) On January 7, 2018, Sergeant Henderson allowed Stout to work after finding that she was still listed as a vestibule worker in the CORIS system. (Transcript 1 at 31.) However, Stout stated that she lost wages between January 8, 2018, and February 4, 2018, because she did not work.[2] (Transcript 1 at 50.)

---

[1] Stout stated that, even though she was terminated on January 10, 2018, she continued to be paid for the vestibule worker job until she took another job in July 2020. (Transcript 1 at 48-50.) Stout began working as an aide on February 8, 2018, despite being designated as a vestibule worker. (Transcript 1 at 51-53, 55.)

[2] Stout filed an informal complaint against Haight for filing a false worker's time sheet for work that she did not perform from January 8, 2018, through February 4, 2018. (Transcript 1 at 50.) Stout was paid $21 for this time and requested that the money be refunded, which it was. (Transcript 1 at 50, 52.)

Stout testified that, on January 10, 2018, Haight came to her cell door, personally handed her the termination notice, and stated, "here you go." (Transcript 1 at 20, 65-66.) At that time, Stout asked to talk to Haight about the termination notice, but Haight replied, "not right now" with no explanation. (Transcript 1 at 66.) Stout stated that her termination notice indicated that she was being removed from her vestibule worker position due to unsatisfactory job performance. (Transcript 1 at 20.) She stated that she was never counseled on her job performance, nor did she ever receive a suspension for unsatisfactory job performance. (Transcript 1 at 21; Transcript of Day 2 of Bench Trial, ("Transcript 2"), Docket Item No. 92 at 73.) Stout stated that she attempted to speak to Haight concerning her termination papers and to request that she be allowed to voluntarily transfer to another position in lieu of being terminated, but she was unable to do so. (Transcript 1 at 18, 21.)

Stout stated that she spoke to A. Thomas, the A-1 Unit Manager, about her termination, and he instructed her to file a regular grievance, which she did on February 13, 2018.[3] (Transcript 1 at 22, 41; Plaintiff's Exhibit No. 1, Docket Item No. 86-2.) She stated that she attempted to get another job, but her job applications, dated January 28, 2018, and February 20, 2018, were returned stating that they were disapproved because they needed her current supervisor's signature.[4] (Transcript 1 at 23, 43-44.) Stout stated that she brought the need to have Haight sign her job applications to Program Assignment Reviewer, ("PAR"),

---

[3] This regular grievance corresponds to the informal complaint dated January 12, 2018, (Transcript 1 at 41), and admitted into evidence as part of Plaintiff's Exhibit No. 1.

[4] Stout explained that, based on the CORIS system, an employed inmate must obtain the signature of the inmate's current work supervisor on her job application before the inmate can apply for another job. She stated that, if she was not a working inmate, no signature was required on the job application; therefore, the application could move forward. (Transcript 1 at 24, 45.)

Gretta Trotter's, ("Trotter"), attention and was instructed to go to Haight. (Transcript 1 at 23.) Stout said she went to Haight, as instructed, but Haight did not sign her job applications. (Transcript 1 at 23.) On rebuttal, Stout testified that she went to Haight on February 14, 2018, and asked Haight to sign her job applications. (Transcript 2 at 74.) Stout said that Haight refused to sign her job applications and told her to "write it up; that's what you do." (Transcript 2 at 74.)

Stout admitted that Trotter advised her that she could get a Sergeant or Unit Manager to sign off on her job applications. (Transcript 1 at 67.) Stout stated that she asked Unit Manager Thomas to sign off on her job applications, but he refused. (Transcript 1 at 67.) Stout then filed a regular grievance on February 23, 2018,[5] stating that Haight was preventing her from getting another job by refusing to sign her job applications. (Transcript 1 at 24-25; Plaintiff's Exhibit No. 2, Docket Item No. 86-1.)

Stout stated that, on March 1, 2018, she received notification that an aide's position that she had applied for on January 30, 2018, had been filled. (Transcript 1 at 45.) Stout testified that her termination papers were not submitted on the CORIS system until July 2020. (Transcript 1 at 19-20.) At that time, Stout stated that, rather than being terminated, her job title was changed. (Transcript 1 at 20.) After being removed from the vestibule worker job in July 2020, Stout stated that she did whatever job was asked of her so that she would not be removed from the honor wing. (Transcript 1 at 48-49.) She stated that, on August 3, 2018, she began working for Assistant Warden Whittington as a courtyard worker. (Transcript 1 at

---

[5] This regular grievance corresponds to Stout's informal complaint dated February 14, 2018. (Transcript 1 at 42; Plaintiff's Exhibit No. 7, Docket Item No. 86-5 at 4.)

47.) She stated that her only responsibility was to take care of the Warden's flowerbeds. (Transcript 1 at 47.)

Trotter, now a probation officer for VDOC, testified that, in January 2018, she was the Institutional Programs Manager for Fluvanna, which included supervising and managing the Offender Work Program. (Transcript 1 at 77-78.) Trotter stated that an offender's current work supervisor had to sign off on the job application if the offender requested a job transfer. (Transcript 1 at 79.) She stated that the supervisor could refuse to sign off on the application based on certain situations, such as not having enough people for a specific job or if the person had a skill that the institution needed. (Transcript 1 at 79-80.) Should the supervisor refuse to sign off on the application, the offender had the option to contact Trotter or someone within the supervisor's chain of command. (Transcript 1 at 81.)

Trotter stated that, if an inmate was not employed, the inmate could file a job application without a supervisor's signature. She explained that, if an inmate is employed, and the inmate wants to transfer jobs, the inmate's current supervisor is required to sign the job application. (Transcript 1 at 88.) Trotter stated that failure to obtain the supervisor's signature on the job application would delay the offender from getting another job. (Transcript 1 at 100.) Trotter stated that, if a supervisor refuses to sign the job application, then the decision would be made as a treatment team, herself included, whether the application would be forwarded to a supervisor or to a potential employer. (Transcript 1 at 92.) She stated that it was customary to tell the offender to attempt to get the supervisor's signature to ensure that they had the opportunity to talk before she intervened. (Transcript 1 at 92.) Trotter stated that, if an offender is terminated, her rule, at that time, was for the offender to wait 60 days before being eligible for a new job. (Transcript 1 at 93.)

Trotter stated that Stout contacted her regarding Haight's refusal to sign off on her job application. (Transcript 1 at 81.) Trotter recalls that Stout was terminated at some point for unsatisfactory performance; however, she does not recall ever receiving a termination notice for Stout. (Transcript 1 at 82-83.) Trotter stated that, although it is preferred that more details are provided regarding the offender's termination, "unsatisfactory performance" is acceptable. (Transcript 1 at 82.) If she had received the paperwork, she would have processed it, and a copy would have been forwarded to Stout. (Transcript 1 at 83.) Trotter explained that, if a termination form was submitted, it would have been forwarded to her by someone in the unit. (Transcript 1 at 84.) She recalled that Stout was not concerned about the termination, but her concern was how she was notified of the termination. (Transcript 1 at 81.) Stout reported to her that she was notified of the termination through another offender. (Transcript 1 at 81-82.) Based on how Stout learned of her termination, Trotter performed an investigation and found that Stout had an issue with multiple offenders in the unit that worked with her, which was one of the reasons she was terminated. (Transcript 1 at 82-83.)

Trotter stated that she left Fluvanna in March 2018, before Stout's matter was resolved. (Transcript 1 at 83-84.) She stated that she could not remove an offender from CORIS unless she had received the actual termination paperwork. (Transcript 1 at 83.) Trotter stated that there should not be a month's delay in receiving a termination notice. (Transcript 1 at 99.) Trotter stated that the notices of termination came to her. She also stated an offender's supervisor was responsible for turning in work dockets or exception reports[6] to the Business Office

---

[6] Trotter stated that work dockets are basically time sheets that are submitted to the Business Office weekly by the offender's supervisor to advise whether the offender is to be paid. (Transcript 1 at 86.)

each week to advise them if an offender did not work, if they were suspended or if they were docking their pay. (Transcript 1 at 86.) Trotter explained that Haight's role is to submit a termination request, which had to be approved, disapproved or reviewed by the work PAR and/or her office. (Transcript 1 at 98.) Haight makes the recommendation to terminate but does not make the actual decision to terminate. (Transcript 1 at 98.) The recommendation for termination is not final until it is signed off on by the work PAR. (Transcript 1 at 98.) Once the work PAR's office signs off on the termination notice, it is entered into CORIS. (Transcript 1 at 98-99.)

On February 12, 2018, Stout completed an offender request, indicating that her applications were being returned for her current supervisor's signature. (Transcript 1 at 104-05.) Trotter stated that she responded to this offender request on February 19, 2018; therefore, as of that date, she was aware that Stout's applications were being denied. (Transcript 1 at 104-05.) Again, on February 14, 2018, Stout completed another offender request, which Trotter responded to the same day. (Transcript 1 at 105.) This request stated that Stout asked Haight to come in and sign the applications, and Haight's response was "no." (Transcript 1 at 105.) Stout requested that Trotter process the application, and to that, Trotter responded that the applications required a supervisor's signature. (Transcript 1 at 105.) Trotter informed Stout that a Building Supervisor or Unit Manager could sign her application, if they could vouch for her work history. (Transcript 1 at 106.)

On February 18, 2018, Stout completed a third offender request, stating that her Counselor, Ms. Lawrence, told her that she should write Trotter to find out if she could place applications being that she filed an informal complaint on Haight. (Transcript 1 at 106.) The offender request also states, "I'm getting the runaround

about this job application issue." (Transcript 1 at 106.) Trotter responded on March 5, 2018, that the offender request had been resolved based on her understanding that Stout had been hired and was working again. (Transcript 1 at 106-07.) Trotter believed that she obtained this information from Haight's replacement, Lieutenant Stone. (Transcript 1 at 107.) She stated that, when she responded "duplicate" to an offender request, it was because the matter was resolved or that she had received numerous request forms about the same topic or question. (Transcript 1 at 108.)

Eric Aldridge, ("Aldridge"), was the Warden at Fluvanna in January 2018. (Transcript 1 at 113.) Aldridge stated that he recalled speaking to Stout about her frustration over her job assignment. (Transcript 1 at 115.) He did not recall Haight being retaliatory or terminating Stout from her position. (Transcript 1 at 115.) Aldridge recalled meeting with Stout and Lieutenant Jackson on December 10, 2019, wherein "a lot of things" were discussed, and he advised Stout to "follow policy." (Transcript 1 at 115-16.) He stated that he recalled Stout speaking to him about being reassigned; yet, every time he saw her in the unit, she was working in the vestibule area in Building 1 and in Building 6. (Transcript 1 at 118, 123.) Aldridge stated that he did not recall a time that Stout did not have a job. (Transcript 1 at 118.) He stated that he instructed the staff to follow protocol, and, if Stout was not removed in accordance to the work program policy, then she was to stay in her current work position or to be put back in the position. (Transcript 1 at 118.)

Aldridge stated that, although his signature is not on the May 2, 2018, Offender Grievance Response-Level 1, the Response shows that the information gathered indicated that Haight did terminate Stout as of January 7, 2018. (Transcript 1 at 125-26, 131; Plaintiff's Exhibit No. 8, Docket Item No. 86-4 at 11-

12.) The Response also indicates that Haight's request for termination was not properly forwarded to the PAR, and, therefore, CORIS was not updated to terminate the job. (Transcript 1 at 131-32.)

Based on the Level 1 Response, Aldridge also stated that a review of CORIS on March 28, 2018, showed that Stout was still listed with an active job assignment of Housing Unit 1 vestibule worker, and she would continue to get paid in this status "per Haight." (Transcript 1 at 137; Plaintiff's Exhibit No. 8 at 11-12.) As indicated on the Level 1 Response, the termination request was signed and submitted by Haight on January 10, 2018, yet, was not signed off on by the work PAR, Trotter; therefore, CORIS was not updated to terminate the job. (Transcript 1 at 137.) The Level 1 Response also states that, per Fiscal Assistant Schlein, "the termination has now been completed and $21 was removed from your reserve account on April 3, 2018. There is no evidence to support your claim that Lieutenant Haight was responsible for this error through purposeful intent." (Transcript 1 at 137.) Aldridge concluded that any failure of the paperwork was just a human error, and the documentation shows that Stout was never terminated from her job as vestibule worker. (Transcript 1 at 137.) He stated that he found no evidence to support Stout's claim that Haight was responsible for this error through purposeful intent. (Transcript 1 at 141.)

Aldridge explained that, if a supervisor recommended termination, the worker would be kept out of work until a hearing was conducted in order for the PAR to review the recommendation. (Transcript 1 at 142.) In Stout's case, the termination recommendation was never signed off on by the PAR. (Transcript 1 at 143.) Aldridge admitted that Stout's termination was recommended, and his investigation showed that she was kept out of work from January 8, 2018, through

February 4, 2018. (Transcript 1 at 143-44.) He confirmed that, eventually, Stout was properly terminated. (Transcript 1 at 144.)

Haight testified that she was a Lieutenant assigned to Housing Unit A-1 from January 9, 2017, through February 5, 2018, working Monday through Friday. (Transcript 1 at 150, 183.) She stated that, in January 2018, her immediate supervisor was Unit Manager Thomas. (Transcript 1 at 151.) Prior to recommending Stout's termination on January 10, 2018, Haight stated that she met with Stout in her office on several occasions due to problems concerning Stout's job performance. (Transcript 1 at 151-52, 154.) Haight stated that, at that time, Stout was very unhappy with her schedule and co-workers; that she was "unhappy in general;" she had a problem with her co-workers getting a different pay rate than she was; and she was frustrated over attempting to apply for a different job. (Transcript 1 at 152.) Haight stated that she also met with Stout concerning the staff's concerns pertaining to Stout's job, such as stepping out of line during the pill line and refusing to take instructions from other staff members. (Transcript 1 at 152-53.)

Haight acknowledged that, on January 10, 2018, she hand delivered Stout's termination papers. (Transcript 1 at 153-54.) She stated that the recommendation for termination was not official until the PAR removed her from CORIS. (Transcript 1 at 184.) She stated that Stout's job was not excellent, but it was not bad; however, Stout was just unhappy in the situation, and she had to let her go. (Transcript 1 at 154.) Haight stated that she tried to work with Stout, but she did not take instructions very well; she was always complaining; and she spent more time mediating with Haight than doing her actual job tasks. (Transcript 1 at 155.) Haight stated that she submitted Stout's termination papers to Trotter, and it was

later brought to her attention that Stout was still designated as vestibule worker in CORIS. (Transcript 1 at 164.) It was then that she learned that Stout's termination was put on hold due to a grievance being filed stating that she paid Stout erroneously. (Transcript 1 at 160.)

Haight stated that she did not submit a weekly job exception report for the pay periods of January 8, 2018, through February 4, 2018, for Stout because she assumed that Stout was terminated. (Transcript 1 at 175-76, 181.) She explained that an individual who is assigned a job in CORIS will be paid default hours unless an exception report is submitted. (Transcript 1 at 181.) She stated that Stout's termination was stopped when Stout filed a grievance for wrongful termination. (Transcript 1 at 160.) Haight stated that she did not input nor remove Stout from CORIS because it was not her job to do so. (Transcript 1 at 174.) Haight stated that she learned that Stout had not been terminated when Stout filed her grievance for wrongful termination. (Transcript 1 at 161-62, 178.)

When Stout later approached Haight in the yard, Haight advised her that she was no longer assigned to her housing unit as of February 4, 2018; therefore, she did not need her signature on job applications. (Transcript 1 at 162.) She advised Stout to see her replacement, Lieutenant Stone. (Transcript 1 at 162.) Haight stated that Stout never came to her with a job application for her to sign; therefore, she could not have refused to do so. (Transcript 1 at 167, 169.) While Stout states that she submitted a job application on January 28, 2018, Haight stated that Stout could not have brought that job application to her because she did not work that day, as it fell on a Sunday. (Transcript 1 at 167.) Haight stated that she did not recall Stout ever coming to her stating that Trotter needed her to come in and sign her job applications. (Transcript 1 at 168-69.)

Haight denied being angry with Stout for writing a grievance on her, stating that Stout "actually wrote more than one on me before, prior to this." (Transcript 1 at 171.) During her direct examination, Haight told Stout: "You lodge informal complaints on almost everything." (Transcript 1 at 152.) Haight denied being upset with Stout for attempting to obtain other employment. (Transcript 1 at 171-72.) She stated that she attempted to help Stout transfer to the tailor shop by personally speaking to the work supervisor about Stout, and she encouraged others to hire her. (Transcript 1 at 172, 185.) Haight stated that, after her transfer, she could not have done anything to prevent Stout from getting another job. (Transcript 1 at 185.) Haight stated that she signed off on Stout's job application submitted for the tailor shop position but did not know why Stout was not hired. (Transcript 1 at 172.)

Julie Schlein, ("Schlein"), a Fiscal Technician at Fluvanna, stated that, in January 2018, she worked as a Fiscal Assistant helping with offender pay and other fiscal tasks. (Transcript 1 at 194-95.) She stated that work supervisors would submit exception reports to her, which show if the employee worked fewer or more than the default 30 hours. (Transcript 1 at 201.) Work supervisors do not submit exception reports if the employee worked only the default hours. (Transcript 1 at 201.) Schlein stated that the system automatically issued a payment to Stout for hours worked during January 8, 2018, through February 4, 2018, for which Stout filed an informal complaint for payment received in error. (Transcript 1 at 196.) Schlein reached out to Haight by email, and Haight confirmed that Stout did not work during this time period due to being terminated. (Transcript 1 at 196-98.) Schlein, therefore, reversed the pay process. (Transcript 1 at 197.) She stated that a review of CORIS on March 28, 2018, reflected that Stout was still listed as a vestibule worker for Housing Unit 1. (Transcript 1 at 197.) Schlein stated that Stout's monthly pay statements show that Stout was paid the default hours from

-12-

December 10, 2017, through January 7, 2018; January 21, 2018, through February 4, 2018;[7] February 11, 2018, through March 4, 2018; March 11, 2018, through April 1, 2018; and April 2018 through January 6, 2019. (Transcript 1 at 203-05; Plaintiff's Exhibit No. 9, Docket Item No. 86-3.) Schlein stated that the week of September 20, 2018, through October 7, 2018, showed that Stout's job assignment changed from Housing Unit 1 vestibule worker to Housing Unit 1 special assignment; therefore, her pay rate increased from 35 cents an hour to 45 cents an hour. (Transcript 1 at 205.)

Andre Thomas testified that he was the Unit Manager of Building A-1 at Fluvanna in January 2018 and that he was aware of Stout's termination. (Transcript 2 at 5-7.) Thomas stated that Stout did her job as a vestibule worker well, and he did not have an issue with her job performance; however, she was unprofessional and caused a lot of disruptions with the other offenders throughout the building. (Transcript 2 at 7, 11.) He advised Stout to do her job and to leave other people alone. (Transcript 2 at 7.) Based on everything that he was aware of, Thomas believed, for safety concerns, that it was in Stout's best interests for her to be removed from the vestibule worker position. (Transcript 2 at 16-17.) Thomas stated that he hired Stout for the vestibule worker position and assigned her to work weekends so she would have less interaction with other offenders. (Transcript 2 at 11-12.) He stated that as a Unit Manager, he could have signed off on Stout's job applications; however, he was never presented with any job applications to sign. (Transcript 2 at 14, 22.) Thomas stated that Haight always showed respect for Stout and the other offenders. (Transcript 2 at 17.) He stated that he was not aware of Haight retaliating against Stout in any way. (Transcript 2

---

[7] January 8, 2018, through February 4, 2018, is the pay period that was subsequently reversed. (Transcript 1 at 204, 206.)

at 17.) Thomas stated that Haight never made any statements to him about receiving Stout's job applications and her refusal to sign them. (Transcript 2 at 21-22.)

Etta Shantell Scott, an inmate at Fluvanna, stated that she signed a refusal to testify. (Transcript 2 at 26-27.) She stated that she worked with Stout on the weekends. (Transcript 2 at 33.) Scott denied signing an affidavit but admitted that, on April 8, 2018, she wrote a statement about a situation that Stout had going on with Haight. (Transcript 2 at 31.) She stated that Haight never told her anything about Stout's job, and she did not know when Stout received her termination notice. (Transcript 2 at 36-37.)

Joseph Stone, a Correctional Lieutenant at Fluvanna, stated that he worked in the A-1 Housing Unit as a Correctional Lieutenant in January and February 2018. (Transcript 2 at 42.) He stated that he replaced Haight when she left the position on February 5 or 7, 2018; thus, becoming Stout's immediate supervisor. (Transcript 2 at 42, 53.) Stone stated that he attempted to get Stout and Haight together to resolve Stout's termination issue but was unable to do so. (Transcript 2 at 43.) He stated that he did not know if it was Stout or Haight who prevented the meeting from happening. (Transcript 2 at 43.) Stone stated that Haight told him that Stout was terminated for unsatisfactory work performance. (Transcript 2 at 48.) Stone stated that he did not have a problem with Stout's work performance, but he had a problem with her and another inmate always "bickering." (Transcript 2 at 44.) He stated that he hired Stout as an aide and then she was transferred back to the vestibule worker position. (Transcript 2 at 44-45.) Stone recalled meeting with Stout, Unit Manager Jones, Warden Aldridge and Captain Goode about reinstating Stout back to the vestibule area. (Transcript 2 at 51.) Stout was placed

back in the vestibule area with a pay rate of 45 cents an hour. (Transcript 2 at 51-52.)

Stone stated that, after Stout was removed from the vestibule job, she submitted job applications to the PAR and then he would approve or disapprove the application once eligibility was met. (Transcript 2 at 53-54.) He stated that he was responsible for hiring for jobs that he supervised. (Transcript 2 at 54.) Stone stated that he never refused to sign a job application for Stout. (Transcript 2 at 55.) He stated that, in February 2018, he would have been the person that Stout would have come to for approval of her taking another job. (Transcript 2 at 55.) Stone agreed that, according to the Offender Work Program Operating Procedure 841.2, lieutenants and other work supervisors can merely recommend termination, and it is the responsibility of the PAR to terminate the offender. (Transcript 2 at 56-58; Defendant's Exhibit No. 1 at 7, Docket Item No. 87-1.) He stated that no work supervisor can remove an employee from CORIS. (Transcript 2 at 58.)

Lana Michelle Slaughter, an inmate at Fluvanna, stated that she wrote a statement after observing Stout crying and Stout telling her why she was crying. (Transcript 2 at 61-64.) Slaughter stated that she was never informed of Stout's termination nor did she ever speak to Haight about Stout. (Transcript 2 at 64.) She stated that she never witnessed Haight retaliate against Stout, as she had never been in the presence of Stout and Haight at the same time. (Transcript 2 at 66.) Slaughter stated that she had a conversation with Haight, who was upset with her for being involved in a case brought against her by Stout. (Transcript 2 at 66-67, 70-71.) She stated that Haight had "never, ever discussed [Stout] before, in any sense of any word, never." (Transcript 2 at 67.)

*II. Analysis*

In order to prevail on a claim for First Amendment retaliation under § 1983, a plaintiff must prove that (1) she engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected her First Amendment rights; and (3) there was a causal relationship between her protected activity and the defendant's conduct. *See Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017). Furthermore, the Fourth Circuit has held that the First Amendment right "to petition the Government for a redress of grievances," U.S. CONST., amend. I, protects a prisoner's right to seek administrative remedies. *See Martin*, 858 F.3d at 249; *see also Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 540 (4th Cir. 2017) ("if an inmate exercises his First Amendment right when he files a prison grievance, retaliation against him for doing so is unconstitutional.")

In 2020, the Fourth Circuit held that the burden-shifting framework set out in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), should apply to evaluate the causation element of a prisoner's retaliation claim under the First Amendment. *See Martin v. Duffy*, 977 F.3d 294, 299-300 (4th Cir. 2020). The Fourth Circuit further held that, after the prisoner plaintiff established a prima facie case of retaliation, including showing that his protected conduct was a substantial or motivating factor in the defendant's adverse action, the defendant may defeat the claim, by proving by a preponderance of the evidence, that the same action would have been taken in the absence of the prisoner's protected conduct. *See Martin*, 977 F.3d at 301.

In this case, Stout claims that Haight retaliated against her for filing administrative remedy requests by refusing to sign her job applications to allow her

to receive another prison job. The undisputed evidence before the court shows that Stout engaged in a protected activity, in that she filed an informal complaint on January 12, 2018, complaining that Haight had terminated her from her vestibule worker job because she believed that Stout intended to file a grievance against her for refusing to raise her rate of pay. (Plaintiff's Exhibit No. 1, Docket Item No. 86-8.) It also is undisputed that Haight, after terminating Stout, did not sign Stout's applications for a new prison job. Haight testified that Stout never brought a job application to her to sign. Haight also said that Stout never told her that Trotter needed her to come to Trotter's office to sign a job application. Haight did admit that Stout approached her on the prison yard one day to discuss signing her job applications. Haight said that she advised Stout that she no longer was assigned to her Housing Unit as of February 4, 2018. Therefore, she no longer was Stout's supervisor, and Stout did not need her signature on job applications. (Transcript 1 at 162.) Haight said she told Stout to see her replacement, Lieutenant Stone. (Transcript 1 at 162.) Thus, the undisputed evidence establishes the first two elements of a retaliation in violation of the First Amendment: protected activity on the part of the plaintiff followed by an adverse action by the defendant.

    I also find that Stout has provided evidence to establish a prima facie case as to causation. Stout testified that, when she spoke to Haight on February 14, 2018, Haight refused to sign her job applications and told her to "write it up; that's what you do." Although Haight denied making any such statement, Stout's testimony is enough to make a prima facie showing that retaliation was a motivating factor in Haight's actions. That being the case, the burden shifts to Haight to prove, by a preponderance of the evidence, that retaliation was not the motivating factor in her actions. I find that Haight has met that burden.

Haight testified that Stout never brought any job application to her to sign before she left her position in the A-1 Housing Unit on February 5. Stout testified only that she submitted a job application on January 28; she did not state that she presented that job application to Haight to sign. In fact, Stout testified that she did not speak to Haight about signing any job application until February 14, 2018, more than a week after Haight was transferred out of the A-1 Housing Unit. Stout testified that the other job application was not submitted until February 20, more than two weeks after Haight left the A-1 Housing Unit. Therefore, the undisputed evidence shows that the reason Haight did not sign Stout's job applications was that she no longer was Stout's job supervisor.

Even if the court found that Haight's conduct was prompted by a retaliatory motive, Stout's claim still would fail because she failed to show that Haight's inaction caused her any damages. The undisputed evidence shows that, even if Haight refused to sign Stout's job application, this refusal did not keep Stout from applying for other jobs. Haight testified that she instructed Stout to take her job applications to the Lieutenant who replaced her in the A-1 Housing Unit, Lieutenant Stone. Trotter also testified that she told Stout that she could have her applications signed by the Unit Manager or Building Sergeant. Stout conceded that Trotter told her this. Both Unit Manager Thomas and Lieutenant Stone testified that Stout never brought them any job applications to sign. Also, the only claim remaining in this case is Stout's claim that Haight's retaliatory refusal to sign off on her job applications caused her to lose wages totaling $21.00 for the period of January 8 to February 4, 2018. However, Stout, herself, testified that Haight's refusal came on February 14, 2018. Stout did not testify that she took any job applications to Haight or spoke to Haight to seek her approval of her job applications any earlier than February 14.

Based on the above-stated reasons, I will recommend that the court enter judgment in the defendant's favor.

## PROPOSED FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following findings, conclusions and recommendations:

1. Stout's evidence at trial presented a prima facie case that Haight refused to sign Stout's prison job applications in retaliation for Stout filing complaints with the prison's administrative remedies system;
2. Haight has shown, by a preponderance of the evidence, that her actions were not taken in retaliation for Stout's protected conduct; and
3. The preponderance of the evidence presented at trial shows that Stout's damages were not caused by Haight's actions.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court enter judgment in favor of the defendant, Haight.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and all unrepresented parties.

**ENTERED**: March 26, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE